642 F.2d 845
 1981-1 Trade Cases 63,954
 Patrick A. MALCOLM d/b/a Spar Oil Company and Spar Oil
Company of Georgia, a Corporation, Plaintiffs-Appellants,
v.
MARATHON OIL COMPANY, Crown Central Petroleum Corporation,
Tenneco Oil Company et al., Defendants-Appellees.
 No. 77-2515.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 April 17, 1981.
 David R. Aufdenspring, Gary G. Grindler, Atlanta, Ga., for plaintiffs-appellants.
 Trammell E. Vickery, John C. Butters, Atlanta, Ga., for Tenneco Oil Co.
 Charles L. Gowen, Joseph R. Gladden, Jr., Michael Eric Ross, Atlanta, Ga., for Marathon Oil Co.
 Morton A. Sacks, Baltimore, Md., for Crown Central.
 Charles Rippin, Edward T. Brennan, Savannah, Ga., for Colonial Oil Ind.
 Appeal from the United States District Court for the Middle District of Georgia.
 Before GODBOLD, Chief Judge, TUTTLE and HILL, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 Patrick Malcolm's former occupation qualifies him as a member of a vanishing breed. From 1965 to 1972 he was an independent gasoline retailer who participated in price wars in south Georgia. By 1972 he had 17 stations and plans for further expansion.
 
 
 2
 Independent gasoline retailers are considered to be mavericks by major brand wholesalers and retailers, because independents post consistently lower prices than major brand retailers. But even among independent retail businesses Malcolm's operation was unusual. Malcolm's "pricing was the key to (his) business." He sought to charge one to two cents per gallon below the price set by other independents. In order to succeed in this marketing strategy Malcolm cut every conceivable expense. He invested little capital in his stations and offered few of the services found at other stations.
 
 
 3
 Malcolm's career as a gasoline retailer ended in 1972. In August, his last supplier refused to sell him additional gasoline. Malcolm failed to locate a substitute supplier. In September and October of that year his stations exhausted their gasoline supplies. As a result Malcolm's retail gasoline business abruptly concluded in a manner resembling the demise of many other independent gasoline retailers.
 
 
 4
 Malcolm, however, did not retire quietly. Even before the exhaustion of his gasoline supplies Malcolm considered filing a lawsuit. Shortly after the closing of his business he acted on those plans. On March 14, 1973 he filed a complaint alleging federal antitrust violations by numerous entities including the five present defendants.
 
 
 5
 Malcolm believed that powerful interests in the gasoline industry desired and achieved his demise. The defendants, predominately marketers of gasoline, had favored relatively high retail prices of gasoline because high retail prices ensured higher wholesale prices and greater profits at all levels of the distribution chain.[1] Malcolm reasoned that his "price cutting" in the retail market disturbed these defendants and others. He then found evidence of communication among the members of the gasoline industry. In discerning a conspiracy from these facts Malcolm apparently adopted the view of Adam Smith who wrote that: "People of the same trade seldom meet together, even for merriment or diversion but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, The Wealth of Nations 232 (Pelican reprint 1980). This conspiracy which disliked price-cutters, Malcolm alleged, took retaliatory actions against him that violated the antitrust laws in two respects. First he claimed that while he was still in business the defendants conspired to influence the retail market by causing his competitors to drop their prices below his costs. Second, when this first tactic did not drive him from the market, the defendants, Malcolm claimed, conspired with all gasoline suppliers to refuse to sell him gasoline for his stations. For these two alleged antitrust violations Malcolm sought monetary damages.
 
 
 6
 Malcolm did not succeed in the district court. That court directed a verdict against Malcolm on both counts for two reasons. With respect to each alleged violation the court found that Malcolm had presented insufficient evidence on the fact of injury and the amount of damages. In appealing this ruling Malcolm contends that he did introduce substantial evidence on these questions and that the district court erred in directing a verdict on those grounds.
 
 
 7
 This Court will limit the scope of its review of this case. The district court ruled the plaintiff's evidence was insufficient only on the issues of injury in fact and amount of damages. That court issued no ruling on whether the defendants violated the antitrust laws. The parties have not fully addressed the alleged conspiracy and substantive violations and, in fact, counsel on both sides agreed in oral argument that because of the scope of the trial court's ruling, this Court must assume that the violations did occur. Thus, this Court will assume that Malcolm sufficiently alleged and proved actions in violation of the antitrust laws and generally will seek only to answer the question: "Given the alleged violations of the antitrust laws, did the plaintiff show substantial evidence of injury and amount of damages?" Upon completion of this review, we believe that the district court erred in ruling that Malcolm introduced insufficient evidence of injury in fact and amount of damages on both claims for antitrust damages.
 
 
 8
 I. Statement of Facts The Plaintiff's Evidence
 
 
 9
 This Court must focus on the plaintiff's evidence. To avoid a directed verdict, Malcolm must have presented sufficient evidence to create a jury question with respect to each element of his case. As plaintiff, he must introduce what this Court has called "substantial evidence to create a jury question." Boeing Co. v. Shipman, 411 F.2d 365, 375 (5th Cir. 1969) (en banc). Substantial evidence constitutes "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id. at 374. The Court, however, should view all the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." Id. Thus, this Court must consider all evidence in such a light, and all statements in this opinion reflect that requirement.
 
 
 10
 This posture of the case requires that the facts be set out in detail.
 
 
 11
 While Malcolm sold gasoline in certain retail markets, the defendant oil companies competed at various marketing levels within the same geographic area. In this area, the defendants operated at the wholesale level, selling gasoline to wholesalers who would sell to retailers.[2] In addition, the defendants would also supply gasoline directly to retailers in Malcolm's area. Defendant Crown Central also sold gasoline at the retail level in some cities where Malcolm had stations.
 
 
 12
 The defendants were not always directly competing with Malcolm at the retail level, but activity at the retail level concerned them. The retail prices indirectly affected the defendants' profits. When retail prices dropped the defendants' wholesale business would suffer. If the defendants' retail customers could not meet the lower prices, the defendants would lose volume. If the defendants cut wholesale prices to allow the retailers to meet low prices, and, thus, retain volume, the defendants' profits margins decreased. As a result, the defendants desired non-depressed retail markets.
 
 
 13
 The pricing practices of retailers would concern the defendants because of this interrelation of the wholesale and retail markets. Because Malcolm was known as a price-cutter who competed against other retailers of defendants' gasoline, his pricing practices would naturally draw their attention. Defendants Tenneco, Marathon and Crown Central without question recognized Malcolm as a price-cutter in the retail gasoline market. One witness stated that among independents Malcolm's stations were recognized as being among the more aggressive price-cutters.
 
 
 14
 Although we all in the independent business are somewhat price cutters, some are more than others. And Spar (Malcolm's business) was one of a group that seemed to be more than others.
 
 
 15
 Testimony was heard that Malcolm's competitors considered his pricing practices a cause of depressed prices and discussed the chances of improving the situation. The discussion included soliciting the aid of Malcolm's last two suppliers in a campaign to persuade Malcolm to raise his prices. In addition, employees of defendant Marathon wrote memoranda indicating their belief that Malcolm's pricing practices contributed to depressed prices. Perhaps the most direct such statement by Marathon came near the end of Malcolm's career in the gasoline retail market when one Marathon employee wrote:
 
 
 16
 Pat Malcolmb (sic) our old marketing thorn from Ty Ty Georgia who in the past under the Spar brand has contributed to numerous bad market conditions, has closed all his stations. (Emphasis added.)
 
 
 17
 The defendants, it may be inferred, were happy when Malcolm retired from the retail market.
 
 
 18
 Proof of unsympathetic thoughts, however, will not entitle an antitrust plaintiff to recover. An antitrust plaintiff must show that the defendants' actions violated the antitrust laws in a manner that gives him standing to sue. At trial, Malcolm attempted to show two types of violations by the defendants and others: 1) a conspiracy to injure Malcolm's business by concerted low pricing among his retail competitors who were pushed into this action by their suppliers, including the defendants; and 2) conspiracy among suppliers, including four defendants, to refuse to sell gasoline to Malcolm in order to drive him out of business. Given the parties' assumption that two violations of the laws occurred, plaintiff Malcolm on this appeal only need show injury-in-fact and amount of damages resulting from the defendants' assumed violations of the antitrust laws.
 
 
 19
 On the pricing count, Malcolm sought to show that the defendants wanted either to coerce him into raising his price to a "normal" price or to force him out of business by "persuading" competing retailers to drastically reduce their prices.[3] Malcolm first sought to show that the defendants employed pricing practices called temporary price allowances. If one of the defendants' customers faced price-cutting competition, the defendants would subsidize his cost of gas to allow him to retain his profit margin while he met the price-cutter's terms. Those favorable arrangements were available to all defendants' retail customers except the initial price-cutter. This practice, Malcolm contended, discouraged potential price-cutters and forced active price-cutters to raise their retail prices.[4]
 
 
 20
 With this mechanism, the defendants, Malcolm alleged, were able to engage in a price-fixing conspiracy. The "normal" price was the price at which dealers could make a living. Prices below normal were depressed. Thus, the defendants and their customers desired normal prices. Such a price level could be maintained because the retailers, fearing punishment through operation of the price allowance system, would obey the "requests" of those representatives of the industry who discouraged deviation from "normal prices." The "normal" price must therefore be viewed as a generally prevailing price that in addition was enforced by the conspirators. And a price-cutter would be viewed as any retailer who set a price below "normal."
 
 
 21
 Malcolm recalled several instances where his competitors went beyond merely meeting his prices. He testified that in several instances the "price-fixing" conspiracy caused Malcolm's competitors to lower retail prices in order to punish him for his failure to enter the conspiracy and raise his prices to normal. He gave several examples of dramatic price drops in areas where his stations were located. In these instances, he testified that: a price would prevail in the market before he entered, he would enter at a price one to two cents below the prevailing price, and his competitors[5] would cut their prices to a level equal to or lower than his price.[6] In some of these instances, Malcolm's competitors lowered their prices beneath Malcolm's costs.[7] He stated that in the time period just before the time period for which he claimed damages the price drops below his cost often occurred simultaneously at every location where he had a station. Malcolm sought to tie these price drops to "price fixing" conspiracy through his testimony that an alleged conspirator threatened to keep retail prices down at all Malcolm's locations unless Malcolm raised his prices to normal. In addition, Malcolm testified that one of his suppliers, an alleged conspirator, revealed the conspirators' strategy by stating that:
 
 
 22
 (T)hey just wouldn't allow (Malcolm) to sell under the market (at Thomasville) and (that Malcolm) would have to go up to the normal price (in Thomasville) in order to get the prices up everywhere.
 
 
 23
 These statements occurred prior to the damage periods. But they may still be used to show the conspirators' intent in the later period. Furthermore, Malcolm testified that one of his competitors told him that prices would soon rise but "they were going to go back down" unless Malcolm raised his prices. From this evidence Malcolm asserts that he presented a jury issue on fact of injury resulting from the "price-fixing" conspiracy's assumed unlawful "predatory pricing" tactics.
 
 
 24
 To complete his presentation on his claims arising under the pricing practices of the price-fixing conspiracy, Malcolm sought to demonstrate the amount of damages caused by such practices. Malcolm's lawyers prepared worksheets detailing Malcolm's revenue and expense figures at nine stations which suffered depressed prices for the appropriate period. They then sought to compare the actual revenue figures with the revenue figures that would have obtained if the defendants had not caused the prices to drop and Malcolm could have followed his policy of setting his prices at one to two cents below the normal price.[8] The difference represents Malcolm's claimed "lost profits" that resulted from the conspirators' pricing practices.
 
 
 25
 Malcolm admits that his calculations are not precise. The prices admittedly varied within these periods. Malcolm's records did not include daily prices, and, thus, his comparisons are based on average monthly prices. In addition, all the calculations are based on the assumption that Malcolm would have retained the same market share if the conspiracy did not exist and normal prices prevailed.
 
 
 26
 When the defendants' pricing practices failed to discourage him, Malcolm alleged that they unlawfully refused to sell him gasoline, a second antitrust violation. The defendants refused to deal with the plaintiff.[9] Assuming, as we must on this appeal, that this refusal constituted an antitrust violation, Malcolm must then show that the refusal caused him injury.
 
 
 27
 Malcolm attempted to show that the defendants' refusal to deal was a material cause of his business' demise. He presented a lengthy narrative of his story concerning how he ran out of gasoline. The story began on June 15, 1972, when Malcolm's Hawkinsville station burned because of the actions of a gasoline delivery truck driver who carelessly unloaded gasoline. Malcolm waited thirty days for his gasoline supplier, Hi-Octane, to pay for the damage to his station. The supplier never acknowledged this responsibility, and Malcolm turned to another supplier. Malcolm had sufficient funds to pay off his account at Hi-Octane but he refused to pay his account apparently because of this dispute.
 
 
 28
 Malcolm's substitute supplier was Stone's. This relationship began on July 15, 1972 and encountered its first difficulty soon thereafter. On August 4, 1972, Stone's threatened to cut Malcolm off on August 15 if he did not settle his overdue account at Hi-Octane. This threat was repeated on August 11. On August 12 or 13, a representative of Stone's, Malcolm testified, talked with him again and told him that he should raise his prices. Then on August 23, Stone's offered to accept Malcolm's leases and put Malcolm on Stone's payroll. Malcolm rejected this offer to "buy him out." Stone's terminated Malcolm's supply on August 31.[10]
 
 
 29
 Malcolm's business then disintegrated. From August 31 to the middle of October, Malcolm's stations exhausted their gasoline supplies. On September 2, Malcolm wrote his lessors that his inability to obtain gasoline necessitated his closing of his stations and prompted his intention to file an antitrust suit. He discussed the possibility of a lawsuit with his attorneys sometime during the month. Malcolm's stations soon began closing. By September 15, at least half of them had closed, although the last station did not close until the middle of October. At the end of September or early in October, Malcolm called additional gasoline suppliers to obtain gasoline. These calls were placed to several suppliers including the four defendants that are gasoline suppliers. Each of the defendants either refused to sell him gasoline or failed to return his calls. Malcolm had similar bad luck in the other calls he made. In addition to these gasoline suppliers that he admitted contacting, there were other uncontacted suppliers known to him. From this evidence,[11] Malcolm contends that he created a jury question over whether the defendants' assumed unlawful refusals to deal led to his failure to get gasoline and the consequent closing of his retail gasoline business.
 
 
 30
 To collect damages for the assumed unlawful refusal to deal, Malcolm attempted to introduce evidence supporting an assessment of damages for the loss of his business. He testified that he made a bona fide effort to obtain an alternative supply of gasoline and from this fact he infers that he offered evidence of his intent to continue the operation of his stations. Evidence of his intent was supported, he argues, by his testimony that he had opened five new stations in 1972 and that he planned to open four additional stations when he was forced out of business. In addition, he points to several leases, some with unexpired terms of several years. And finally, he testified that he did not intend to sell his stations after building up volume. From this evidence, Malcolm believes that he gave the jury a basis for concluding that his business would have continued for some undetermined period into the future. Malcolm also provided an estimate of his profits per period in order to complete his proof on amount of damages suffered on the closing of his business. His accountant, Allen, testified concerning Malcolm's profits for the first eight months of 1972. In the course of business in 1972, Allen prepared profit worksheets for Malcolm's operations. Allen testified that Malcolm had a net profit for those eight months, with the last three months' profits offsetting losses in the first five months. These figures, Malcolm contends, provide his best estimate of the operation's future profitability.
 
 
 31
 II. Evaluating the Appropriateness of a Directed Verdict for the Defendants
 
 
 32
 Malcolm's claim to damages arises under section 4 of the Clayton Act which provides that:
 
 
 33
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 34
 15 U.S.C. § 15. As with any private plaintiff proceeding under section 4, Malcolm "must prove (1) a violation of the antitrust laws, (2) cognizable injury attributable to the violation, and (3) at least the approximate amount of the damage." Chrysler Credit Corp. v. J. Truett Payne, Inc., 607 F.2d 1133, 1135 (5th Cir. 1979), cert. granted, --- U.S. ----, 101 S.Ct. 70, 66 L.Ed.2d 20 (1980).[12] We recognize that there are often no neat dividing lines between the elements of proof required to obtain a damage award for antitrust violations. See Pollock, The "Injury" and "Causation" Elements of a Treble-Damage Antitrust Action, 57 Nw.U.L.Rev. 691, 694-95 (1963); Note, Private Treble Damages Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 80 Harv.L.Rev. 1566, 1573 (1967) (hereinafter cited as Harvard Note). See also Terrell v. Household Goods Carriers Bureau, 494 F.2d 16, 21 (5th Cir. 1974). Nevertheless, the posture of this case forces an assumption of antitrust violations and an inquiry into the causal connection of such assumed acts to matters of damage. To avoid the directed verdict on the grounds given by the trial court, Malcolm need show he introduced substantial evidence of injury caused by the alleged violations and the amount of damages.[13]
 
 
 35
 A. "Predatory Pricing" to Enforce a "Price Fixing" Conspiracy
 
 
 36
 Malcolm's first claim presents a damage theory that is, as he labels it, counter-intuitive. He claims he was injured by a price-fixing conspiracy that included the defendants. Indeed, Malcolm presented evidence tending to show the existence of a price-fixing conspiracy, although we do not pass on whether this evidence was sufficient to create a jury question with respect to the defendants. A conspiracy to fix retail prices is undoubtedly an antitrust violation.[14] But, without more, a retailer in such a market could only with difficulty prove injury to his business by the conspirators' raising of retail prices, because such a retailer would obviously benefit if retail prices increase. See Harvard Note, supra, at 1573.
 
 
 37
 Malcolm, however, makes additional claims. He alleged and attempted to show at trial that in further violation of the antitrust laws the defendants belonged to a conspiracy that used "predatory pricing" in the retail markets to injure Malcolm and other price-cutters.[15] Given this enforcement mechanism, a retail price-fixing conspiracy could easily injure retailers such as Malcolm. Predatory pricing is clearly an antitrust violation.[16] Predatory pricing differs from healthy competitive pricing in its motive: a predator by his pricing practices seeks "to impose losses on other firms, not garner gains for itself."[17] Assuming that such action occurred in this case[18] Malcolm has more to prove in order to show his right to recover antitrust damages.
 
 1. Causation of Antitrust Injury
 
 38
 Assuming the existence of predatory pricing violations, Malcolm should encounter relatively less difficulty in proving an antitrust injury resulting from unlawful conduct of this sort.
 
 
 39
 If predatory pricing occurs it will most likely harm honest competitors within the markets where the predatory prices are posted. The very purpose of predatory pricing is to cause injury to a competitor's business. In cases where the defendants' acts are motivated by intent to injure the plaintiff, the inferential leap to the finding of fact of damage, is not great. Indeed, one court has found it to be virtually nonexistent:
 
 
 40
 Such damage need not be made patent item by item as on a balance sheet. The mere unlawful combination over a period of time to eliminate competition is proof of damage.
 
 
 41
 Fox West Coast Theatres Corp. v. Paradise Theatre Building Corp., 264 F.2d 602, 608 (9th Cir. 1958). In this case, given the assumption of predatory pricing conduct, Malcolm's business would be directly injured by depressed market prices. Regardless of a businessman's reaction to predatory pricing some injury will almost certainly follow: if he retains his price he will lose volume and if he lowers his price he will have a smaller margin of profit on each unit sold.[19] His total revenues, and hence profits, will usually decrease in a depressed market.[20] Malcolm, in this case, provided the district court and jury with evidence of injury caused by the violation when he testified that a particular price generally prevailed, on his entry to the market he set a slightly lower price, and after his entry into the market his competitors dropped to a predatorily low price.[21] This evidence easily translates into a finding of lost revenue and, hence, profits for Malcolm's business. By this evidence, Malcolm offered proof that the price was often below what he, in his business judgment, obviously believed was his profit-maximizing price in a competitive market; hence, he offered proof that he was in fact injured[22] by these low prices.[23] The district court's ruling on this point accordingly must be reversed.
 
 2. Amount of Damage
 
 42
 Once beyond the question of fact of damage, the antitrust plaintiff's task is eased. The antitrust plaintiff's burden of proving the amount of damages is lighter than the burden of proving injury in fact. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 23-24 (5th Cir. 1974). Often the nature of the violation makes calculation of damages difficult. "In such (a) case, while the damages may not be determined by mere speculation, it will be enough if the evidence show(s) the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). The amount of damage may be shown by just and reasonable inference with juries voting upon the probable and inferential as well as upon direct and positive proof. Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 23-24 (5th Cir. 1974); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). In fact, given proof of the fact of damage, proof of losses which border on the speculative is allowed in order to facilitate the policy of the antitrust laws. Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874, 887 (1st Cir. 1966); Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894, 903 (5th Cir. 1973). And estimates may be based on assumptions so long as the assumptions rest on adequate bases. Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 24 (5th Cir. 1974); Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894, 902 (5th Cir. 1973). The estimate of the amount of damages may even suffer from minor imperfections. Id. at 903. Each sale and the amount of loss on the transaction need not be shown; averages may be used to show that the plaintiff generally lost money over a period of time. See Bray v. Safeway Stores, Inc., 392 F.Supp. 851, 863-65 (N.D.Cal.1975). And a non-expert's testimony regarding the past sales volume and profit margin may be used to measure damages. See Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 580-81 (5th Cir. 1980) (Coors II ). The defendant is not relieved of liability just because the plaintiff does not show the exact volume and price figures possible within the damage period. Id. at 581. As the Coors II Court stated: "To hold otherwise 'would enable (the defendant) to profit by (its) wrongdoing at the expense of (its) victim.' " Id. at 581 (quoting Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)).
 
 
 43
 Guided by these principles indicating a lenient standard of proof, this Court must reverse the district court's directed verdict which was made in the belief that the plaintiff's evidence on the amount of damage was insufficient. Malcolm's proof of the amount of damage was not precise. But assuming that a plaintiff has offered sufficient evidence of the fact of damage, a directed verdict against that plaintiff on the amount of damages is proper only in the most unusual circumstances. Malcolm's proffered evidence offered a comparison of actual revenues with the revenues possible absent the defendants' actions.[24] This comparison is the essence of proof of damage. Malcolm presented evidence of his monthly average prices rather than evidence of his actual daily prices. But the use of averages is acceptable. Built into the average monthly price figure is every instance when Malcolm decreased his price beneath the "one to two cents below normal price" that was his desired level. These instances are the times when Malcolm was forced to lower his prices.[25] The specific instances, about which Malcolm testified, constituted only examples of the pricing actions that Malcolm has alleged to be unlawful. The full range of the allegedly unlawful activity then is mirrored in Malcolm's average monthly prices. As Malcolm's prices track the market prices,[26] a comparison of these figures with the potential revenues if "normal" prices prevailed would constitute the heart of a plaintiff's proof of the amount of damages in a case such as this one. The directed verdict on this ground was improper.
 
 
 44
 B. Refusal to Deal by the Price-Fixing Conspiracy
 
 
 45
 Malcolm sought to prove that when the conspiracy's predatory actions failed to drive him out of business, the conspirators turned to sterner measures. The conspiracy allegedly refused to sell Malcolm any gasoline needed for his stations.[27] This action, Malcolm claims, put him out of business, because it dried up his supply of his only product, gasoline.
 
 
 46
 The alleged antitrust violation lay in the concerted refusal of the defendant-suppliers and others to sell any gasoline to Malcolm. A unilateral refusal to deal is not unlawful. See United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Poor credit may constitute a defendant's proof that the refusal to deal was a unilateral rather than conspiratorial decision. See Scott Medical Supply Co. v. Bedsole Surgical Supplies, Inc., 488 F.2d 934, 938 (5th Cir. 1974); Coughlin v. Capitol Cement Co., 571 F.2d 290, 301 & n.22 (5th Cir. 1978). Furthermore, concerted activity in refusing to deal is not unlawful but concerted activity that is based on an illegitimate motive is forbidden.
 
 
 47
 (A concerted) refusal to deal becomes unlawful when it produces an unreasonable restraint on trade, i. e., if there is an anticompetitive purpose or effect in selecting those with whom one will deal. A refusal to deal may not be used as a device to achieve some anticompetitive goal such as to acquire a monopoly, or to fix prices, or to establish market dominance and drive out existing competitors, or to aid the enforcement of unlawful resale price restrictions and territorial allocations, or to increase the seller's own market dominance, or to enforce a boycott, or to promote the predatory practices of the seller. This requirement of illegitimate purpose or effect marks the distinction between concerted activity which is an innocent aspect of business and concerted activity which is inimical to competition.
 
 
 48
 Aladdin Oil Co. v. Texaco, Inc., 603 F.2d 1107, 1115 (5th Cir. 1979) (footnotes omitted). For example, suppliers and retailers may not combine together to refuse to deal with a troublesome retailer in order to drive out that maverick. E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, 467 F.2d 178, 186-87 (5th Cir. 1972); see Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).
 
 
 49
 This Court need not decide whether Malcolm has proven that the defendants' refusal to deal constitutes an antitrust violation. Because the trial court did not direct a verdict on this ground both sides have assumed, without conceding, that the defendants' refusal was an antitrust violation. This Court will assume that the defendants' refusal was unlawful and review the district court's action only on the causation and damage grounds.
 
 1. Causation of Antitrust Injury
 
 50
 Malcolm, as a private plaintiff, must prove that the defendants' actions caused his injuries. In this case in order to claim lost future profits as damages, he must prove that the defendants' refusal to deal caused him to close his gasoline stations.
 
 
 51
 The general standards for a plaintiff's proof of causation are clear. Malcolm need not show that the refusal to deal was the sole cause of the loss of his business. See Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1321 (5th Cir. 1976); Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 20 (5th Cir. 1974); Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874, 885 (1st Cir. 1966). He need only show that the defendants' illegal conduct was a material cause of some damages. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969).
 
 
 52
 (A) plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4 (of the Clayton Act, 15 U.S.C. § 15).
 
 
 53
 Id. If some suppliers refused to sell Malcolm gasoline for valid reasons and the defendants' unlawful refusal eliminated other potential sources of gasoline, the defendants could nevertheless be liable to Malcolm.
 
 
 54
 Those basic principles are simple to apply in this case. Malcolm attempted to show that his last supplier, Stone's, was a part of the conspiracy and its refusal to deal was unlawful. The defendants claim that Stone's refused to sell to Malcolm because of his poor credit and there was no evidence that Malcolm would have been cut off if he had paid his debt. If the defendants are correct, Stone's refusal was lawful. Malcolm, however, offered evidence that Stone's was a conspirator in the unlawful concerted refusal to deal. In any event, we need not determine this fact question because we assume that the violation alleged by Malcolm did occur. But even if the refusal of Stone's was lawful, this fact would not, under the principles outlined above, excuse subsequent unlawful refusals by the defendants. Nor would it decrease the compensable injury suffered by Malcolm, because the subsequent refusals by the defendants would still be necessary to put Malcolm out of business. If the defendants had sold Malcolm gasoline at that time he could have remained in business. And, thus, those refusals would be a "material cause" of that injury. The arguments of the defendants paraphrase the district court's order and share the order's mistaken premise that the antitrust violation must be the sole cause of the defendant's injury.
 
 
 55
 The defendants next claim that their refusals could not have caused the demise of Malcolm's business because their refusals followed Malcolm's decision to terminate his business as indicated in a letter written in early September. This is a fact question and does not entitle the defendants to a directed verdict. Malcolm testified that he wrote the letter under the impression that Stone's refusal to deal had put him out of business. He also testified that later he genuinely sought gasoline to keep his business alive. This letter obviously does not strengthen Malcolm's case but it does not permit a directed verdict against him. An inference may be drawn from the evidence that after writing the letter, Malcolm changed his mind and legitimately sought gasoline to keep his still viable business alive.
 
 
 56
 The defendants further argue that their refusal in any event did not cause the exhaustion of Malcolm's gasoline supply, because Malcolm failed to contact all known alternative suppliers of gasoline. They contend that this evidence shows that Malcolm voluntarily abandoned his business and the alleged illegal refusals did not cause his business' demise.[28]
 
 
 57
 Language in some opinions seemingly supports the defendants' contentions. The Court of Appeals for the Sixth Circuit has stated that:
 
 
 58
 An essential element in attempting to establish the fact of damage because of exclusion from a specified source of supply is the lack of an alternative comparable substitute for the desired merchandise.... In Ace Beer Distributors, Inc. (v. Kohn, 318 F.2d 283 (6th Cir. 1953)) this Court said at page 287: "There is no allegation or contention that the beer of other breweries was not just as available in that area after the change of distributors as it was before."
 
 
 59
 Elder-Beerman Stores Corp. v. Federated Department Stores, Inc., 459 F.2d 138, 148-49 (6th Cir. 1972). In commenting on Elder-Beerman, the Court of Appeals for the Fourth Circuit has stated that the case "stands for the uncontroversial principle that a § 4 plaintiff, like any other, must prove actual injury in order to recover." Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1305 (4th Cir. 1979). This view would be premised upon the notion that a refusal to deal by some suppliers could not close a business that can avoid the effects of the concerted refusal by turning to another supplier. If such a business closes, under this reasoning, it would be because of the plaintiff's failure to tap alternative sources and not because of the concerted refusal to deal.[29]
 
 
 60
 We agree that in a refusal-to-deal case, a plaintiff who bypasses an obviously adequate alternative supplier should not recover for the loss of his business. But we do not agree that a plaintiff, seeking to recover damages because of an unlawful refusal to deal, must show a lack of an alternative supply.
 
 
 61
 Malcolm claims that the conspiracy foreclosed him from purchasing gasoline supplies. If a retailer is unlawfully denied his sole product by his supplier and others he would quickly be out of business unless he took further action. The end of his business in any event would be causally linked to the refusal. Thus, the refusal has in fact injured the retailer.
 
 
 62
 But an antitrust victim must seek to minimize the amount of his damages. A victim of an unlawful refusal to deal must attempt to locate suitable substitutes for the denied goods. In such a case, this Court has articulated that concept: "An antitrust plaintiff has a duty to mitigate damages." Golf City, Inc. v. Wilson Sporting Goods Co., 555 F.2d 426, 436 (5th Cir. 1977).[30] He must take "reasonable steps to merchandise substitute (goods)." Borger v. Yamaha International Corp., 625 F.2d 390, 399 (2d Cir. 1980). If the victim takes such steps but fails to find an alternative source, the amount of damages would not be decreased by the mitigation efforts. If he finds an alternative source, he may still be injured if he would have been better off without the refusal, but the amount of damage would be reduced. See note 29 supra.
 
 
 63
 In any event, Malcolm prevails on this issue. Even if Malcolm was under a "duty" to minimize his damages the defendants were not entitled to a directed verdict, because the "burden of showing that the victim of tortious conduct failed to minimize his damages rests with the wrongdoer." Tennessee Valley Sand & Gravel Co. v. M/V Delta, 598 F.2d 930, 933 (5th Cir. 1979) (citing Golf City, Inc. v. Wilson Sporting Goods Co., 555 F.2d 426, 436 (5th Cir. 1977)). The defendants must show that the injured party's conduct was unreasonable and aggravated the harm. Id. at 933. The defendants did no more than establish that Malcolm failed to contact a few known suppliers of gasoline. They did not establish that those dealers could or would have sold Malcolm the needed product in sufficient quantities to keep his business alive. The defendants, thus, did not prove a failure to mitigate damages.
 
 
 64
 Even if the burden was on Malcolm, he would still prevail on this point. Requiring an antitrust plaintiff to prove such a negative as a lack of alternative supply places too great an obstacle in the way of antitrust recovery. The greatest burden that reasonably could be placed on him would be the burden to show the reasonableness of his mitigation efforts. And even if Malcolm had that burden, we would hold that he has met this burden by introducing evidence of his efforts to obtain alternative suppliers of gasoline. This proof consisted of Malcolm's testimony that his numerous calls to gasoline suppliers failed to secure him any gasoline. The district court's ruling on this point accordingly, must be reversed.
 
 2. Amount of Damages
 
 65
 The district court also directed a verdict against Malcolm for a failure to offer substantial evidence of the amount of damage. We must disagree with the district court's judgment.
 
 
 66
 Many of our statements regarding the amount of damage from the prior count are again applicable. Once the "fact of damage" is proved a lower standard of proof controls the proof of "amount of damage." See Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 20-21 (5th Cir. 1974). Various formulations of the standard by the Supreme Court support the notion of a lessened standard.
 
 
 67
 (T)he jury may make a just and reasonable estimate of the damage based on relevant data .... In such circumstances "juries are allowed to act on probable and inferential, as well as upon direct and positive proof."
 
 
 68
 Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946) (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 564, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931)). This relaxed standard is based on a recognition of the difficulty in reconstructing events that might have happened but for the defendant's unlawful conduct. It is appropriate that if there is uncertainty, the defendant should bear the burden of that uncertainty because his unlawful actions created it.
 
 
 69
 Malcolm sought to recover his lost future profits. The relaxation of standards of proof are particularly appropriate in cases where the finder of fact must estimate lost future profits. When "damages must be assessed so as to approximate the future profits of a business, a court and a jury necessarily enter into the realm of the imprecise and the uncertain." Lehrman v. Gulf Oil Corp., 464 F.2d 26, 45 (5th Cir. 1972).
 
 
 70
 On this issue Malcolm's evidence of past profits sufficed to create a jury issue regarding the amount of damages suffered in the form of lost future profits. Evidence of past earnings is generally acceptable proof on this issue. Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874, 887 (1st Cir. 1966). His evidence consisted of the business' profit record for the last eight months. Surely a longer history would ordinarily be desirable but on the facts of this case, it may not have been either desirable or appropriate. Malcolm's profit records were prepared in the ordinary course of business by his accountant who testified regarding their accuracy. The records were not reflective of a remote isolated period in the middle of Malcolm's business history they reflected Malcolm's performance over the eight months period just preceding the demise of his business. In addition, records of the business' earlier performance were not nearly as relevant given the expansion of Malcolm's business from 12 stations at the beginning of 1972 to 17 stations in August of 1972 when he lost his gasoline supplier.[31] Because of these circumstances, we believe that Malcolm's proof of his profit over his last eight months of business sufficed to create a jury question on his lost profits.[32]
 
 
 71
 Even assuming the past profits are a sufficient basis for projection of lost future profits, the defendants argue that the plaintiff's case is fatally flawed because he gave no evidence of how long he would have stayed in business. But these other arguments are also without merit. This Court has previously found evidence of future duration of a business to be inferable from evidence of a plaintiff's age, health and desire to remain in business. Lehrman v. Gulf Oil Corporation, 500 F.2d 659, 670-71 (5th Cir. 1974). Malcolm offered comparable evidence. He testified that his plans for future expansion were cut short by the defendants' refusal to deal. In addition, he testified that he was making a bona fide effort to locate gasoline.[33] Moreover, Malcolm introduced evidence of several long-term leases that indicated his intentions to remain in business.[34] Thus, the jury could infer that Malcolm would have stayed in business but for the refusal to deal.
 
 
 72
 Under these facts, we believe that Malcolm introduced sufficient evidence to create a jury question on the issue of amount of damages resulting from the defendants' unlawful refusal to deal, and the district court's ruling must be reversed.
 
 Conclusion
 
 73
 We hold that with regard to both counts, Malcolm introduced substantial evidence of causation and amount of damage. This holding rests partially upon the assumption that Malcolm produced substantial evidence to prove the antitrust violations he alleged. But we offer no present opinion regarding whether Malcolm actually produced sufficient evidence for a jury to conclude that the defendants violated the antitrust laws in a manner that gives standing to Malcolm. Instead we merely reverse the order of a directed verdict for the reasons that were argued to this Court and the trial court.
 
 
 74
 REVERSED and REMANDED for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Four defendants, Marathon, Tenneco, Crown Central, and Colonial Oil Industries sold gasoline at various marketing levels. The fifth defendant, Georgia Independent Oilmen's Association, did not sell gasoline, but was accused by Malcolm of facilitating the price fixing and predatory pricing that Malcolm accused the other defendants of implementing
 
 
 [2]
 One defendant, Tenneco, sold gasoline to Malcolm's last supplier of gasoline. Thus, this defendant was apparently an indirect supplier of Malcolm
 
 
 [3]
 His records could not adequately support a claim for damages under this count at all his stations so his claim included damages for only some of his stations. Although neither side considered it important enough to brief, the record reveals that those stations were in Acree; Adel; Albany; Cordele; Cochran; Clyattsville; Macon; Moultrie; and Valdosta. Malcolm similarly limited his claim for damages to a specific time period. The record reveals that this period extended from June, 1971 to August, 1972
 
 
 [4]
 This system would not fully explain the occasions when his competitors allegedly decreased their prices beneath his costs. This system apparently only explains drops in prices to meet Malcolm's price. Because the extent of the price drops constitute a part of the substantive violations, we need not deal with any difficulty in this part of the plaintiff's case
 
 
 [5]
 Malcolm did not always specify which competitor decreased their prices. But it is clear from his testimony that the generally prevailing price in the market drastically dropped even if not all his competitors dropped their individual prices. We think this testimony was sufficiently specific to accomplish the same purpose as testimony that all his competitors dropped their prices. It is also clear that when he described these price drops he intended to convey the idea that all his competitors participated in the drops
 
 
 [6]
 Not all of these instances were within the locations and time periods for which damages were claimed. But some were within the relevant areas and time periods
 
 
 [7]
 See note 4 supra
 
 
 [8]
 The trial court had misgivings about Malcolm's proof relating to revenues, actual or hypothetical. The trial court initially rejected the proof of the actual revenues and costs as summarized by Malcolm's lawyer, because it found Malcolm had not established the effect of the conspiracy, a prerequisite for establishing the amount of damages. The court later admitted this summary of Malcolm's revenues and expenses for this period. Malcolm originally sought to show potential revenues by introducing calculations of revenues based on purely hypothetical retail price levels. The trial court rejected the projected revenues assumed in the tendered exhibits because no one testified on the possibility of actually selling gasoline on the various hypothetical price levels
 
 
 [9]
 Tenneco did not turn Malcolm down but rather did not return Malcolm's call. Malcolm evidently claims that this failure to return his call constitutes an unlawful refusal to deal
 
 
 [10]
 Stone's stated that the reason for the cutoff was the debt to Hi-Octane. Stone's concern for the debt was more than an ordinary concern about Malcolm's credit. Both Stone's and Hi-Octane were acquired by the same company in the summer of 1972. Malcolm knew that these two companies belonged to the same larger organization
 
 
 [11]
 On an issue not presently before the Court, Malcolm sought to show that the defendants and other suppliers in refusing to sell gasoline to him acted unlawfully to further the "price-fixing" conspiracy by eliminating his stations. He first offered the general evidence that he claimed tied the suppliers to the conspiracy the suppliers' dislike of price-cutters and their attempts to injure him by their pricing practices. In addition, Malcolm introduced evidence showing that other price-cutters were refused supply. And testimony was given that indicated that prices increased after Malcolm and other price-cutters left the market. And on cross-examination by one of the defendant's lawyers, one witness in the gasoline retail and wholesale business testified that Malcolm was the only retailer refused supply before any shortage of gasoline and no one, to the witness' knowledge, had ever been denied supply because of a failure to pay his bills
 
 
 [12]
 The requisite proof may be divided into four categories: "the ... antitrust violation, the fact of injury, the requisite causal relationship between violation and injury, and the amount of damages." See Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1306 (4th Cir. 1979). Regardless of the segmentation of the plaintiff's case, the same total proof makes the case
 
 
 [13]
 Of course, this statement is conditioned on our assumption that Malcolm introduced substantial evidence of the two antitrust violations. If there was no violation, defendants' actions, even if harmful to Malcolm, did not cause him any antitrust injury. See Pollock, supra, at 694-95
 
 
 [14]
 Indeed, it is a "hard core" per se offense of the antitrust laws and is open to criminal prosecution. See Baker, To Indict or Not To Indict: Prosecutorial Discretion in Sherman Act Enforcement, 63 Cornell L.Rev. 405, 406-08 & n. 20 (1978)
 
 
 [15]
 We infer from Malcolm's brief that predatory pricing is his desired claim. Malcolm's basic claim is that the defendants' price-fixing activities violated § 1 of the Sherman Act. But he claims that his injury resulted from the defendants' contrivance of low retail prices in order to later fix these prices at a high level. He apparently treats this enforcement action as if it is separate from the activity he labels as "price-fixing." But it is not clear exactly what label he would attach to the enforcement mechanism. In his main brief, Malcolm never precisely labels this alleged violation as predatory pricing. Neither does he state which section of the antitrust statutes this action violated. Nor does he cite controlling case law that defines the substantive offense. Although both parties agree that this Court need not pass on the alleged violations, some background discussion of the law allegedly violated would have been helpful in determining the extent, if any, of Malcolm's antitrust injury. Nevertheless, Malcolm does state in his brief that the pricing practices were designed either to gain his cooperation with the price-fixing conspiracy or to drive him out of business. Malcolm, in his reply brief, does begin to label the violations as "predatory price-cutting." Without clearer allegations, these statements indicate that Malcolm believed that the defendants' actions constituted predatory pricing with intent to monopolize, a violation of § 2 of the Sherman Act, 15 U.S.C. § 2
 This interpretation of Malcolm's theory is bolstered by his complaint, where he alleges that in order to fix retail prices, some of the defendants:
 sold below cost for long periods at various of defendants' retail stations located in cities where Plaintiffs did business to cause Plaintiffs to return to retail prices set and approved by members of the conspiracy.
 Malcolm apparently viewed this as a violation of § 2, because in discussing the refusal to deal claim against Stone's, not presently a party, Malcolm accused Stone's of "predatory practices" in an attempt to monopolize "in violation of section 2 of the Sherman Act." These alleged "predatory practices" by Stone's involved:
 Sale of gasoline on their retail level at the same time as and at a price lower than their wholesale price.
 Although Malcolm's pleading and briefing may leave something to be desired, this Court understands that the violation he alleged and attempted to prove was predatory pricing in an attempt to monopolize.
 The defendants were alleged to be members of a conspiracy that took such unlawful action. The conspiracy and pricing action constitute the violation in this case. Price-fixing may have been the defendants' ultimate goal, but it is extremely misleading to frame the issue before this Court as "whether Malcolm was harmed by a price-fixing conspiracy."
 Of course, Malcolm may have intended to allege some other, as yet unnamed, antitrust violation. He may even have viewed the setting of low prices as merely another form of "price-fixing." But the general outline of the offense alleged clearly resembles that of predatory pricing, because Malcolm alleges that the defendants used prices to punish him or injure his business. And for the purposes of discussing causation and damage, the alleged offense is identical to predatory pricing. Thus, we will simply refer to the alleged violations under this count as "predatory pricing," and we will assume that even if Malcolm does not believe that the relevant action constitutes predatory pricing, whatever action he has described would constitute some other antitrust violation.
 
 
 [16]
 Predatory pricing violates § 2 of the Sherman Act, 15 U.S.C. § 2, when there is an attempt to monopolize, see United States v. American Tobacco Co., 221 U.S. 106, 180-84, 31 S.Ct. 632, 648-50, 55 L.Ed. 663 (1911); Standard Oil Co. v. United States, 221 U.S. 1, 43, 31 S.Ct. 502, 509, 55 L.Ed. 619 (1911), § 2 of the Clayton Act, 15 U.S.C. § 13, when the predation includes price discrimination, see Moore v. Mead's Fine Bread Co., 348 U.S. 115 (1954), and § 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, under any circumstances. The issues, with regard to predation are the same under all those provisions. Williamson, Predatory Pricing: A Strategic and Welfare Analysis, 87 Yale L.J. 284, 284 n.1 (1977). A private right of action, however, does not lie for a violation of § 3 of the Robinson-Patman Act, Nashville Milk Co. v. Carnation Co., 355 U.S. 373 (78 S.Ct. 352, 2 L.Ed.2d 340) (1958), although some lower courts had, at one time, been of the opposite view. See 5 J. von Kalinowski, Antitrust Laws and Trade Regulation § 37.01(4) (1976). In any event, § 2 of the Sherman Act may be used by private plaintiffs who suffer a violation of § 2 of the Sherman Act. See Ovitron v. General Motors Corp., 295 F.Supp. 373, 377-78 (S.D.N.Y.1969); see generally Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975)
 
 
 [17]
 L. Sullivan, Handbook of the Law of Antitrust 111 (1977). See Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1955). Judicial formulations of the predatory pricing concept often turn on the inherently vague test of intent: if an alleged predator "desires" that its pricing practices injure its competitors, it was using predatory pricing. See L. Sullivan, supra, at 108-09
 Two writers have suggested that a strictly economic test replace the subjective intent test: predatory pricing occurs when pricing policies yield returns below average or marginal cost, whichever is lower. Areeda & Turner, supra note 13. See also R. Posner, Antitrust Law 184-96 (1976). This suggestion is offered as a way to provide an objective standard as a substitute for proof of intent. One author has defended the focus on the subjective intent of the defendant as proved by less precise means. L. Sullivan, supra, at 109-12. This defense is based on the inherent unreliability of economic measurements and judges' and juries' relative ease in understanding human motivations apart from applied economics. Id. Such objections challenge the feasibility of a cost-based approach to a trial context.
 The Courts of Appeal have recently shown varying degrees of favor toward cost-based tests such as the test proposed by Areeda & Turner. See Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., 615 F.2d 427, 430-32 (7th Cir. 1980); California Computer Products, Inc. v. IBM Corp., 613 F.2d 727, 742-43 (9th Cir. 1979); Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 857 (9th Cir. 1977); Pacific Eng'r & Prod. Co. v. Kerr-McGee Corp., 551 F.2d 790, 797 (10th Cir. 1977); Hansen v. Shell Oil Co., 541 F.2d 1352, 1358 (9th Cir. 1976); National Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630, 637-38 & n.34 (D.C.Cir.1976); International Air Indus. v. American Excelsior Co., 517 F.2d 714, 723-25 (5th Cir. 1975).
 This consideration of cost-based tests meets with mixed results. Professors Areeda and Turner would generally welcome such a trend. And these developments have been hailed by others. See, e. g., 11 Ga.L.Rev. 960 (1977). But, as noted above, Professor Sullivan has an aversion to cost-based tests, and following the beginning of this trend, scholars have voiced objections to the accuracy and hence desirability of Areeda and Turner's cost-based test. Williamson, Predatory Pricing: A Strategic and Welfare Analysis, 87 Yale L.J. 284, 285 (1977); Scherer, Predatory Pricing and the Sherman Act: A Comment, 89 Harv.L.Rev. 869, 898 (1976). In any event, this classic debate among the titans of the antitrust world rages still. Compare Williamson, supra and Williamson, Williamson on Predatory Pricing II, 88 Yale L.J. 1183 (1979) and Scherer, supra with Areeda & Turner, Williamson on Predatory Pricing, 87 Yale L.J. 1337 (1978) and Areeda & Turner, Predatory Pricing: A Rejoinder, 88 Yale L.J. 1641 (1979) and Areeda & Turner, Scherer on Predatory Pricing, 89 Harv.L.Rev. 891 (1976).
 This Court need not presently offer its views on this debate. But before he may get his case to a jury, Malcolm must establish the existence of the substantive violation of predatory pricing in the time period and markets for which he intends to claim damages. On this appeal, he is greatly aided by our assumption that he proved the substantive violation alleged.
 
 
 [18]
 The trial court specifically stated that its directed verdict was based only on lack of evidence on causation and amount of damages. Given this limitation, the simplest method of handling this appeal would be to assume the existence of whatever violations Malcolm alleged and to limit our holding to causation and damages. Proceeding under that method we assume that Malcolm proved predatory pricing traceable to some extent to the defendants' actions that intermittently took place over a 15 month period in the several markets serviced by the nine of Malcolm's stations for which he claimed damages
 The trial court, however, did not entirely agree with this perception of the case. It sometimes viewed parts of the substantive violation as if they were parts of the causation question. We can and do simply hold the trial court to the explicit limits of its directed verdict order. But, in the alternative, such parts of the trial court's order may be answered directly as well.
 For example, the trial court, in explaining its direction of the verdict, asked: "How can the jury conclude that just because anybody went down in price at the time Mr. Malcolm went down that that was caused by the conspiracy? That's sheer guesswork." This question seems directed at the alleged violation rather than causation, although it is framed in causation terms. A drop in prices is perfectly legal, but a drop in prices instigated by a conspiracy to rid the market of price-cutters would be unlawful. See note 17 and accompanying text supra. In any event, Malcolm did offer evidence tying the conspiracy to the price drops when he offered evidence of: 1) alleged conspirators' threats of price drops unless he increased his prices; 2) simultaneous price drops at every location where he had a station; and 3) the defendants' antipathy toward price-cutters as evidenced by their temporary price allowances that placed price-cutters such as Malcolm at a competitive disadvantage. This evidence should suffice to create a jury question regarding the conspiracy's connection to the price drops, assuming the existence of a conspiracy. Intent behind predatory pricing, or, as in this case the connection between the conspiracy and the unnaturally low prices, is not susceptible of direct proof, L. Sullivan, supra note 14, at 111, because conspirators are unlikely to leave such proof. It seems to place too great a burden on plaintiffs to show separate intent behind each discrete instance of low prices once evidence of a conspiracy has been introduced.
 Similarly, the trial court, while commenting on Malcolm's testimony asked: "(I)f the defendants did not go down (in price) in concert, then where is the cause and effect of the conspiracy." These comments resulted from the trial court's perceived conflict in Malcolm's testimony, where on direct examination, Malcolm stated that in 1971 and 1972 his competitors "dropped the price" and then on cross-examination, he stated that "every competitor didn't drop his price when I dropped mine." At most this inconsistency, challenges the credibility of Malcolm and is not a proper ground for a directed verdict. And in any event, not every competitor need be a conspirator before Malcolm's business is injured.
 In addition, the trial court was troubled because Malcolm had not specifically stated which competitors dropped their prices. The trial court asked:
 How is the jury going to conclude who went down? And why they went down? Just on the word "everybody." You can't prove a conspiracy by saying everybody did it, gentlemen.
 This statement carries two meanings. First, it challenged the effect of the violation. Malcolm specified the competitors of each of his stations. If he stated on direct examination that all of them went down in price, his meaning is sufficiently clear. His credibility may be improved by a second specific recitation of the competitors' identities when the specific price drops were discussed. But if Malcolm intends to accuse them all of such action, it is not clear why he could not make such a statement in the simplest possible terms. Second, this statement challenges the existence of a conspiracy, but the trial court explicitly reserved judgment on whether a conspiracy has been proved.
 
 
 [19]
 This is not a novel observation
 In a case involving similar price-cutting by competitors, the Supreme Court summarily concluded that the record contained sufficient evidence of injury to the plaintiff's business and property resulting from the unlawful combination, and, in discussing the amount of damage the Court noted that:
 (I)t is fair to say that the natural and probable effect of the combination and price cutting would be to destroy normal prices ....
 Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).
 In discussing the proof of causation in a private antitrust case, one author has stated that:
 There are three stages of proof in treble damage cases: first, that defendant committed a violation; second, that it caused plaintiff some harm; third, the amount of the harm. In some cases, evidence establishing the violation will support the inference that plaintiff must have suffered some harm as a result it will, in short, establish the first two elements of the case together. Thus, in Story Parchment Co. v. Paterson Parchment Paper Co., proof that defendant cut prices below the cost of production in order to drive plaintiff out of business would without more justify the conclusion that defendant must have caused plaintiff, one of his competitors, some loss, unless other evidence rebutted it.
 Harvard Note, supra, at 1573 (footnote omitted). The situation envisioned by that author greatly resembles Malcolm's case.
 In another context, one court has discussed the effect of an ultimate buyer-defendant's actions in depressing the market price for the goods upon the original sellers:
 (T)here was sufficient evidence that the plaintiffs sold cattle in a market at prices depressed due to the acts of the defendant. It was the defendant who created an environment into which the plaintiffs were forced to sell their wares.... That this economic manipulation had a direct adverse effect on the plaintiffs cattlemen attempting to sell in a depressed market is obvious.
 Bray v. Safeway Stores, Inc., 392 F.Supp. 851, 863-64 (N.D.Cal.1975) (citation omitted), cause dismissed following settlement by parties, 403 F.Supp. 412. See also Cackling Acres, Inc. v. Olson Farms, Inc., 541 F.2d 242 (10th Cir. 1976).
 
 
 [20]
 An antitrust plaintiff must show an anticompetitive injury of the kind envisioned by the antitrust laws. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, an injury resulting from normal price competition would not entitle the plaintiff to recover. But any injury resulting from predatory pricing would be an anticompetitive injury because the substantive violation is anticompetitive, by nature it is distinguished by definition from normal competitive pricing and lost sales or profits are the kind of injury to be remedied by a private right of action
 
 
 [21]
 The existence of low prices may be part of the proof of the substantive violation. Assuming that the legal requisites for proof of the predatory pricing violation were satisfied, the evidence of low prices would also be part of the proof of damage. Because of the nature of predatory pricing, this evidence would be used to prove both the violation and the fact of damages. Thus, to show the fact of damage Malcolm must have introduced evidence of low prices which we will assume constituted the violation
 Malcolm met this requirement with three forms of evidence. First, he testified about instances where in relevant markets his competitors set unnaturally low prices that dropped to near his wholesale costs. Second, Malcolm points to testimony by others of low or depressed prices in various retail markets. Third, Malcolm also introduced evidence of his own average monthly retail prices. And, if his method of calculating damages is followed, from these averages, a Court can derive the approximate average monthly price prevailing in the independent retail markets. This conclusion follows because Malcolm claims that he priced one to two cents per gallon below the prevailing independent price. And if the average prevailing price, thus derived, is below the "normal price" Malcolm would claim that this piece of evidence shows the existence of depressed prices in a third way.
 We are aware that Malcolm's stations generally operated in different markets, even though Malcolm in his brief has made no attempt to detail the relevant markets and time period or to show specifically how his stations in these relevant markets were injured. His proof relevant to the injuries claimed are merely lumped together with proof relating to markets and time periods for which damages are not claimed. Malcolm left it for the court to sort this evidence. Evidence of depressed prices in Macon would not affect the profits of Malcolm's station in Valdosta. But those depressed prices would injure the profits of Malcolm's Macon station. Thus, there was evidence of injury because there was evidence of low prices in several relevant markets. And if the low prices, shown to exist in at least some of the relevant markets, constituted predatory pricing violations, Malcolm has shown the possibility of at least, some antitrust injury. Any further inquiry then must be directed at the proof of the amount of damage in those markets. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969). And Malcolm's evidence of depressed prices as derived from his own prices would be evidence of depressed prices in all relevant markets. Thus, Malcolm would have shown some injury at all nine stations for which damages are claimed.
 
 
 [22]
 Cases involving maximum price ceilings set by defendants in other cases are urged upon us by the present defendants who apparently argue that those cases offer a useful analogy on the present causation issue. We agree that these cases are somewhat analogous, but we believe they do not undercut the plaintiff. Malcolm has satisfied the injury-in-fact requirements of those cases. See Kestenbaum v. Falstaff Brewing Corp., 575 F.2d 564 (5th Cir. 1978) (plaintiff must show that he could have sold same volume at higher prices in a free market and in absence of defendant's restraints on maximum price). These cases did not involve major disruptions of market prices. Where these plaintiffs were restrained from raising prices, they must still demonstrate why they could have raised prices absent the restraint. Without evidence that the prevailing market prices was higher than the restrained price this showing of injury would be difficult. In this case, it is clear that if the market price had not been lowered below normal, every retailer could have raised his prices without losing volume. Thus, Malcolm does not have as difficult a proposition to prove as did those plaintiffs in the price restraint cases. He has sufficiently shown that his profit-maximizing price was greater than the low market price effectively set by the conspirators in those specific instances of unnaturally low prices testified to by Malcolm. And with respect to the other periods of time when the prices were below normal, we think it is sufficiently clear that if the market prices rose, Malcolm could and would have raised his prices
 The Ninth Circuit has on one occasion found that a requirement such as the one in Kestenbaum is unnecessary. In that case, Judge Hufstedler wrote that:
 Rather than imposing the nearly impossible burden of proving what each dealer would have done if he had been free to make his own pricing decision, we assume that, absent evidence to the contrary, a dealer would have raised his prices had it been profitable to do so; that is, dealers are profit maximizers. This assumption merely amounts to a recognition that a "restraint" in fact restrains. The defendants can attempt to show plaintiffs would have kept their prices beneath a maximizing point despite their violative behavior. Contrary evidence might include dealer testimony that he would not have raised his price, or a showing by the defendants that the dealers had reasons other than the restraint for selling below a profit-maximizing price.
 Knutson v. Daily Review, Inc., 548 F.2d 795, 812 (9th Cir. 1976). We need not follow the Ninth Circuit rule in order to hold that Malcolm did produce sufficient evidence of his injury in fact, because Malcolm did offer evidence that retail prices were lowered below the price level he had chosen.
 The defendants, at this point, make an interesting argument. They assert that Malcolm's marketing philosophy conflicts with his damage theory on this count. Malcolm testified that he often lowered his prices to increase his volume and the defendants argue that this testimony contradicts his damage theory which holds that Malcolm was injured when the defendants' conspiracy forced him to lower his prices to meet depressed prices caused by the defendants' acts. The defendants argue that Malcolm should have sold a larger quantity when he lowered his prices to meet the predatory prices in the market than when he sold gasoline in a free market. In support of this argument, the defendants cite the work of an economist who was once retained by Malcolm:
 (E)xperience shows that, if other things remain equal, buyers will buy a larger number of units of a good at a lower price than they will at a higher price.
 R. Pfouts, Elementary Economics: A Mathematical Approach 22 (1972). Many economists have undoubtedly expressed similar opinions because this tenet is basic to the price theory of economists. But this view of the "laws" of supply and demand does not undercut the plaintiff's case. The key assumption in the quotation is found in the phrase "if other things remain equal." In this case, Malcolm could expect to sell at least the same volume at a higher price if all his competitors abandoned predatory pricing and raised their prices back to the "normal price." If they took that action Malcolm could actually expect to increase his volume because he would regain his only competitive advantage the ability to price below other independent retailers in a freely competitive market. Upon regaining that advantage Malcolm could return to his policy of pricing one to two cents below other independents and his relative market share, and hence volume, would naturally increase. Under the defendants' asserted view of economics Malcolm would be privileged to sell his goods in a market of depressed prices created by the defendants.
 Defendants also urge upon us Chrysler Credit Corp. v. J. Truett Payne, Inc., 607 F.2d 1133 (5th Cir. 1979), cert. granted, --- U.S. ----, 101 S.Ct. 70, 66 L.Ed.2d 20 (1980) and Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc., 527 F.2d 417 (5th Cir. 1976) as examples of the proper application of directed verdicts with respect to antitrust issues of causation and damage. We find that those cases are distinguishable from this case. Neither Chrysler Credit nor Foremost-McKesson concerned alleged actions that were as inherently destructive or as calculated to injure as the actions alleged in this case. The rebates, discounts and other actions challenged in those cases can very easily serve competitive purposes. A part of the substantive violation of predatory pricing is the intent to injure competitors. Given the intent behind predatory pricing and the natural tendency of such action to injure, it is correct that we not demand, in this case, the stronger evidence of causation required by those two cases. Moreover, Foremost-McKesson may also be distinguished because of the numerous evidentiary deficiencies in that plaintiff's case. In an action against a competitor, that plaintiff failed because: it also engaged in "all or nothing bidding," one of the challenged practices; was not at all shut off from obtaining "exclusives" such as those it challenged were held by the defendant; and failed to specify other alleged losses.
 
 
 [23]
 We repeat that this is a cognizable antitrust injury only if it was the result of predatory practices, not if it was the result of normal competitive policies
 
 
 [24]
 Malcolm prepared summaries of his expenses and revenues for the relevant time period. The revenue records contain Malcolm's average monthly retail prices as derived from Malcolm's business records that were also in evidence. The defendants attack the validity of the revenue and expense figures, but these arguments are directed to the accuracy of these figures. The key variable is the retail price figure, and we will focus on it. See Story Parchment Co. v. Paterson Parchment Paper Co., 283 U.S. 555, 561-62, 51 S.Ct. 248, 49-50, 75 L.Ed. 544 (1931). In computing the amount of his damage, Malcolm attempted to demonstrate that amount by estimating how much he would have increased his retail price but for the actions of the conspiracy. He offered evidence that he set his prices one to two cents below the independent retail competition. There was evidence from the defendants' records and testimony of a "normal price" that prevailed in absence of price depressions that Malcolm asserts were created by the defendants. Thus, Malcolm claims that he would have set his price at one to two cents below the "normal price" but for the defendants' allegedly unlawful acts. The difference between this projected price and Malcolm's actual average monthly price represents Malcolm's lost revenue per gallon of gasoline sold. He assumes his relative share of the retail market, and hence his volume, would remain constant in these calculations because all retail prices would rise by at least as much as his prices. From these figures his lost profits may be derived in substance
 A chart comparing these figures for one city would be illustrative. Set out below is a chart of the figures for Macon. Macon is apparently the city for which the most complete records are available. Included for further illustration in this chart are price figures of Malcolm's Macon competitors whose data is available in some of the exhibits. These same exhibits show the normal price in Macon.
 Macon 1971
--------------------------------------------------------------
Macon Prices
 per gallon Jan. July Aug. Sept. Oct. Nov. Dec.
--------------------------------------------------------------
Regular Gas
 Malcolm Avg. 29.9 29.9 30.0 29.9 29.3 27.2 N/A
--------------------------------------------------------------
Market Range 30.0 33.9 26.9 24.9 29.9 25.9 25.9
 to to to to to to
 34.9 34.9 32.9 33.9 33.9 33.9
--------------------------------------------------------------
Normal 34.9 34.9 34.9 34.9 34.9 34.9 34.9
--------------------------------------------------------------
Premium Gas
 Malcolm Avg. 30.0 30.9 31.9 33.9 30.2 29.9 N/A
--------------------------------------------------------------
Market Range 32.9 35.9 29.9 28.9 32.9 27.9 28.9
 to to to to to to to
 33.9 38.9 36.9 37.9 37.9 37.9 36.9
--------------------------------------------------------------
Normal 38.9 38.9 38.9 38.9 38.9 38.9 38.9
--------------------------------------------------------------
 Macon 1972
 Jan. Feb. Mar. Apr. May June July Aug.
--------------------------------------------------------------
Regular
 Malcolm Avg. 29.1 28.6 27.8 28.1 28.4 28.6 27.9 28.6
--------------------------------------------------------------
Market Range 25.9 28.9 26.9 26.9 25.9 26.9 27.9 28.9
 to to to to to to to to
 33.9 29.9 28.9 32.9 32.9 34.9 32.9 34.9
--------------------------------------------------------------
Normal 34.9 34.9 34.9 34.9 34.9 34.9 34.9 34.9
--------------------------------------------------------------
Premium
 Malcolm Avg. 32.3 31.7 30.0 31.4 32.0 33.1 31.2 33.6
--------------------------------------------------------------
Market Range 28.9 31.9 30.9 28.9 28.9 30.9 31.9 32.9
 to to to to to to to to
 37.9 32.9 31.9 36.9 36.9 38.9 36.9 38.9
--------------------------------------------------------------
Normal 38.9 38.9 38.9 38.9 38.9 38.9 38.9 38.9
--------------------------------------------------------------
 There is a fact question regarding the true level of normal prices. The normal prices shown in the chart were taken from defendant Tenneco's records. Other evidence offered by Malcolm, and taken from defendant Marathon's records, showed that the defendants perceived the normal Macon price for regular gasoline to be 32.9, Pl.Ex. 291, Pl.Ex. 365, and the normal Macon price for premium gasoline to be 36.9. Pl.Ex. 291. Malcolm also testified that in some instances, the normal price was 30.9 or 29.9 for regular. Resolution of this difference would be for the jury.
 None of the other exhibits cited by the plaintiff indicate what level of retail pricing is considered normal for independent retailers. Those exhibits prove other points. Nevertheless, no evidence indicates that a different "normal price" would be expected in the several other Georgia cities where Malcolm had gasoline stations. Indeed, in reading the exhibits discussing the "normal prices," one gets the belief that normal prices were fairly uniform throughout the region. Therefore, we will take the normal price proved for Macon to be the normal price for the other Georgia cities where Malcolm had stations.
 The reliance on the "normal price" as a benchmark for showing the price Malcolm could have charged absent the conspiracy arises from the trial court's rejection of Malcolm's exhibit showing hypothetical revenue projections based upon hypothetical retail gasoline prices. The trial court indicated some willingness to admit this exhibit if Malcolm in his capacity as a businessman testified regarding the likelihood of his ability to achieve the otherwise hypothetical prices. Malcolm's counsel did not take this hint to offer the necessary foundation for this exhibit containing hypothetical figures. Under these circumstances, we disagree with Malcolm and feel that the trial court correctly refused to admit the hypothetical figures, although we do not indicate whether such testimony by Malcolm as suggested by the trial court would have cured the defect.
 In any event, Malcolm may, we believe, rely upon the "normal price" as his benchmark to prove the amount of damage.
 
 
 [25]
 Malcolm did not testify that, in response to the market price drops, he lowered his price. But he would clearly be injured by such general price decreases and we can infer that he did lower his price, because he did offer evidence that he sought to compete on the basis of low prices and to stay one to two cents beneath the market. Thus, it is natural to expect that if the general market price decreased, Malcolm would follow that price in order to fulfill his marketing philosophy and to preserve his only competitive advantage. It would be unrealistic to expect that a small businessman would remember his daily reaction to market prices
 
 
 [26]
 Of course, the defendants may attempt as a defense to show that Malcolm caused the market prices to decrease rather than the market forcing Malcolm to decrease his price. But we need not resolve this problem on this appeal
 
 
 [27]
 Malcolm also testified that one of the conspirators, his last supplier, sought to buy him out just before the refusal to deal
 
 
 [28]
 Malcolm responds that even if the refusals to deal did not directly force him out of business, he may still claim damages for the loss of his business because the pricing practices oppressed his business. A plaintiff need not "retain possession of a business oppressed by anti-trust violation until the business is bankrupted or directly shut down by the violator." Pollock & Riley, Inc. v. Pearl Brewing Co., 498 F.2d 1240, 1244 (5th Cir. 1974). Malcolm is correct that he may voluntarily close his business and still collect lost future profits if he can show that the defendants' antitrust violations forced him out of business. This Court has stated that:
 We do not accept (the defendant's) restrictive application of the principle of future profits as antitrust damages. When a practice condemned by the Sherman Act puts a small operator out of business, we do not think it matters whether the antitrust violator directly closes down the small proprietor or whether he takes anti-competitive steps which foreseeably will result in the proprietor's demise if carried on for a sufficient amount of time.
 Lehrman v. Gulf Oil Corp., 464 F.2d 26, 45 (5th Cir. 1972). Although Malcolm correctly states the law, these principles do not aid him because his proof does not show that the defendants' oppressive pricing practices forced him out of business. This isolated mention of the defendants' "oppressive" pricing practices does little to bolster his argument for damages based on future profits. All his other arguments and proof at trial were directed at showing that he was entitled to such damages because a concerted refusal to deal put him out of business. He may not under these circumstances argue that the oppressive pricing practices caused his business' demise. His proof as discussed in his brief fails to show a causal link between the pricing practices and his closing his service station.
 
 
 [29]
 Of course, a plaintiff who does tap an alternative source may still prove some injury if a change of suppliers results in other losses such as increased costs or decreased revenues. See Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1305 (4th Cir. 1979). This recognition will not greatly aid Malcolm who seeks to recoup future profits
 
 
 [30]
 This formulation is slightly inaccurate, because an Hofeldian plaintiff has no "duty" where there is no correlative right. Ellerman Lines, Ltd. v. The President Harding, 288 F.2d 288, 289 (2d Cir. 1961) (citing Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16, 30-32 (1913)). The rule may be conceived as a method of apportioning damages between the parties. And its proper formulation is that a defendant is not liable for post-injury consequences avoidable by the plaintiff who uses reasonable care. See Tennessee Valley Sand & Gravel Co., v. M/V Delta, 598 F.2d 930, 932-33 (5th Cir. 1979); Ellermen Lines, Ltd. v. The President Harding, 288 F.2d 288, 289-90 (2d Cir. 1961)
 
 
 [31]
 Moreover, Malcolm had plans for further expansion that are in no manner accounted for in his evidence of profit history. Malcolm also argues that these figures are conservative for an additional reason the defendants' "predatory" pricing practices reduced Malcolm's profits in 1972
 
 
 [32]
 We recognize that courts have disapproved of estimates based on short, unrepresentative periods. See, e. g., Hanson v. Shell Oil Co., 541 F.2d 1352, 1360-61 (9th Cir. 1976). But on the facts of this case a longer period would not necessarily represent a true picture and we have no reason to believe the period was unrepresentative
 
 
 [33]
 The only purpose of this effort could have been to keep his stations open
 
 
 [34]
 Admittedly, Malcolm could cancel these leases but that fact does not mean that the leases carry no evidentiary weight