Osnat KLEIN and husband, Mel Klein, Plaintiffs,

v.

HENRY S. MILLER RESIDENTIAL SERVICES, INC., et al., Defendants.

Civ. A. No. CA–3–78–0829–J.

United States District Court, N. D. Texas, Amarillo Division.

June 30, 1982.

652

Daniel L. Penner, Penner & Jones, Darrell L. Keith, Fort Worth, Tex., for plaintiffs.

Paul S. Adams, Jr., Johnson, Bromberg, Leeds & Riggs, Stanley Neely, John H. McElhaney, Orrin Harrison, III, Locke, Purnell, Boren, Laney & Neely, W. B. West, III, Clark, West, Keller, Butler & Ellis, Dallas, Tex., Weldon Parkhill, Parkhill, Parkhill & Hackler, Grand Prairie, Tex., Guy W. Hull, Guy W. Hull, II & Associates, Garland, Tex., Jerome Prager, Hoppenstein & Prager, Charles O. Shields, Ray, Anderson, Shields, Trotti, & Hemphill, Robert H. Mow, Jr., Carrington, Coleman, Sloman & Blumenthal, Patrick F. McGowan, Strasburger & Price, Arthur F. Selander, Winstead, McGuire, Sechrest, & Trimble, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

MARY LOU ROBINSON, District Judge.

This is a private antitrust action brought under Section 4 of the Sherman Act for alleged violations of Section 1 of the Sher-

man Act, 15 U.S.C. § 1. The Plaintiffs, Osnat and Mel Klein, are the sellers of a used single-family residential dwelling in Dallas County, Texas. The Defendants are various realtors, boards of realtors, and real estate listing associations in Dallas County, Texas. The cause is before the Court on the Plaintiffs' Motion for Class Certification.

I. *Factual Background*

The Plaintiffs were homeowners in Dallas, Texas, in 1978. Early that year the Plaintiffs decided to sell their home and began contacting real estate brokers for assistance. Each broker contacted by the Plaintiffs quoted a brokerage commission of six percent of the sales price of the home, and each broker refused to negotiate the fee. On April 29, 1978, the Plaintiffs signed an exclusive listing agreement with Defendant Henry S. Miller Residential Services, Inc.

Shortly after signing the exclusive listing agreement the Plaintiffs contacted an attorney about the uniform commission quoted by the various brokers. The Plaintiffs were informed that the uniform commission rate was a possible violation of the antitrust laws, and the complaint initiating this action was drafted.

On June 30, 1978, the Plaintiffs sold their home through the services of Henry S. Miller Residential Services, Inc. The Plaintiffs paid the Henry S. Miller Residential Services, Inc., a six percent commission on the $52,500 sales price of the home.

On July 6, 1978, the Plaintiffs filed this action for monetary, injunctive, and declaratory relief on behalf of themselves and all others similarly situated.

II. *Claims in Contention*

The Plaintiffs allege that the Defendants have engaged in concerted action to fix and maintain commission rates for the sale of used residential real estate at artificially high levels. The Plaintiffs further allege that the Defendants have conspired to restrict membership in listing associations, to restrict broker franchisees, and to adopt rules and regulations restricting competition among brokers in Dallas County, Texas.

The Plaintiffs seek certification of this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure or, in the alternative, certification under one or more subdivisions of Rule 23(b)(2). The Plaintiffs define the class they seek to represent in two ways:

(1) all persons who have sold residential real estate in Dallas County, Texas, in whole or in part through the services of Defendants subsequent to July 1, 1974, and who have been injured by the alleged unlawful acts of the Defendants (as alleged in the complaint).

(2) all persons who have sold single-family residential real estate in Dallas County, Texas, in whole or in part through the services of the Defendant brokers and/or broker franchises of the Defendant broker franchisors which residential real estate was listed with Defendant listing associations, and/or multiple listing service of Defendant board of realtors, such sale being subsequent to July 1, 1974, and resulting in a fee or commission of six percent charged and paid.

The Defendants deny all allegations of concerted price-fixing and maintain that class action is inappropriate because (1) the Plaintiffs have not satisfied the requirements for certification found in Rule 23(a) of the Federal Rules of Civil Procedure, (2) individual questions predominate over any common questions of fact and law, (3) the proposed class is unmanageable, and (4) the Plaintiffs have not satisfied the notice requirements of Rule 23(c)(2).

III. *The Real Estate Industry in Dallas County*

In order to determine whether this action is appropriate for class certification the Court must first analyze the real estate industry with respect to the product, the sellers, and the buyers. A full understanding of the underlying facts is essential to the correct application of the require-

ments of Rule 23. *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309 (5th Cir. 1978).

### A. Structure of the Brokerage Industry

The brokerage industry in Dallas County is made up of a highly structured association of Real Estate Boards, Multiple Listing Services, Real Estate Franchisors and Franchisees, as well as individual brokers and agents.

The Defendant Board of Realtors are trade associations with the declared purpose of uniting persons engaged in the real estate business in Dallas County with the Texas Board of Realtors and the National Association of Realtors. The term "Realtor" is the exclusive possession of the National Association of Realtors and its use is regulated by the national association.

Within Dallas County the Dallas Board of Realtors has jurisdiction of the City of Dallas and all outlying areas except the cities of Irving, Grand Prairie, and Garland. Jurisdiction of those cities lies with the Irving, Grand Prairie, and Garland Boards of Realtors. The various boards have the right and duty to control the use of the term "Realtor" in their territory.

The Defendant Multiple Listing Services (MLS) are divisions of the Defendant Boards. The MLS maintains a central registry of all homes being offered for sale by MLS members in the Dallas area. Membership in the MLS and access to the central registry is limited to members of the Defendant Boards. Members of the MLS are obligated to attempt to obtain exclusive listing from sellers of used residential property. The exclusive listing guarantees the listing broker a share of the sales commission even though the actual sale may be consumated by another member of the MSL. The broker or agent who makes the sale shares in the commission. Only exclusive listings are published in the central registry. The failure to turn in an exclusive listing to the MLS can result in a fine or expulsion from the service.

To become a member of the Defendant Boards and thus have access to the MLS an individual must (1) possess a real estate license, (2) furnish written application to the Boards, (3) furnish evidence of a sound credit rating, (4) maintain regular office hours in a commercial location, (5) complete a course of instruction and pass an examination, (6) pay a $250.00 application fee.

Most of the thousands of individuals engaged in the real estate business in Dallas function as independent contractors of real estate firms. Other real estate brokers and agents function as employees for firms such as the Defendant Colwell Bankers. Still others function independently in the profession in either a full or part time capacity. Most of the brokers and agents in Dallas County are members of the various Defendant Boards.

### B. The Brokerage Fee and Product Market

Brokerage fees in Dallas County have traditionally been set on a contingent fee basis. Before 1970 the Dallas Board of Realtors maintained rules to insure that its members charged a uniform contingent fee. From 1923 to 1958 the Dallas Board of Realtors required its members to charge a minimum commission of five percent of the sales price of the home sold. In 1958 the minimum commission was raised to six percent of the sales price. In 1970 the Dallas Board of Realtors eliminated the express rules for a uniform fee.

From 1970 to 1978 the cost of housing in Dallas County doubled while the number of homes sold increased by 100%. Notwithstanding the increased base price of homes sold and the absence of a mandatory minimum commission, there was substantial uniformity in commission rates in Dallas County during the years 1974 to 1978. Approximately 90% of all homes sold in the City of Dallas yielded a six percent commission. Likewise, 89% of the homes sold in Garland yielded a commission of six percent. Many of the homes sold which were not listed and sold at a six percent commission were homes yielding a seven percent commission or new homes sold at three percent.

While there was a general absence of price competition in Dallas County from

1974 to 1978, the same was not true for service competition. In addition to traditional selling techniques such as advertisement and open houses, real estate firms provided assistance in financing, market analysis, relocation services, insurance services, and other sales promotions. Service techniques were especially differentiated during periods of short term sluggish real estate markets.

During the time in question a few brokers in Dallas County did not conform to the general pattern of non-price competition. Two witnesses testified that they operated for a short time as discount brokers in Dallas County, charging a fee of three percent. Another witness testified that he had operated for awhile as a full service broker offering his services at three percent or a flat fee ranging from $300.00 to $600.00. None of the three witnesses are now engaged in the real estate profession.

### IV. *Substantive Legal Issues*

In order to determine whether this action should be certified for class treatment the court must identify the substantive legal issues which will control the outcome of this litigation. *State of Alabama v. Blue Bird Body Co., Inc., supra* at 316. The purpose of inquiry into the legal issues is to discover whether the contours of the case satisfy the requirements of Rule 23(a) and 23(b) and not to weigh the merits of the positions urged by the parties.

### A. *Sherman Act Violations*

■ Section 1 of the Sherman Act proscribes "every contract, combination ... or conspiracy in restraint of trade or commerce." The word "every" is not meant literally, and for many restraints a rule of reason has been applied to judge their lawfulness. *Standard Oil Company v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Under the rule of reason the courts must weigh the competitive harm of a particular restraint against the nature and magnitude of any legitimate objective of the restraint. If the anti-competitive effect of the restraint outweighs its contributions to competition, or if such contribution can

be obtained by a less restrictive alternative means, it is void as an illegal restraint on trade. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Some restraints on trade are so anti-competitive and so often lack any redeeming virtues that they are presumed illegal. *Broadcast Music, Inc., v. Columbia Broadcasting Co.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). When a class of restraints falls within this *per se* catagory courts need not determine whether the authors of the restraint possess the power to inflict public injury nor whether it is justified by any procompetitive purpose or effect. *United States v. Socony Vacuum Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Combinations or agreements between competitors "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce are illegal *per se.*" *United States v. Socony Vacuum Oil Co., supra* at 223, 60 S.Ct. at 844.

### B. *Clayton Act Requirements*

■ Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained." A private antitrust plaintiff must show both that he has been damaged and some indication of the amount of his damage to prevail in a private antitrust action. *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir. 1974). The fact of damage, or impact, must be proved as a matter of fact and with a fair degree of certainty. The amount of damage may be established by just and reasonable inference as well as direct and positive proof. *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 858 (5th Cir. 1981).

Turning to the allegations contained in the Plaintiffs' complaint it is clear that one issue to be resolved at trial is whether the Defendants conspired to fix and maintain real estate brokerage commissions in Dallas

County. That issue can be resolved under the law relating to *per se* violations of Section 1 of the Sherman Act. *See, United States v. Socony Vacuum, supra* 310 U.S. at 223, 60 S.Ct. at 844. Another issue to be resolved is whether the alleged restrictive practices of the Defendants effect an unlawful restraint on trade. That issue will most likely be resolved under the rule of reason. *See, United States v. Multi-List, Inc.,* 629 F.2d 1352 (5th Cir. 1980).

With respect to each of these alleged violations the Plaintiffs must prove impact to business or property and some indication of the amount of their damages to recover.

### IV. *Rule 23(a) Requirements*

■ With these background matters in mind the Court turns its attention to the propriety of certifying this cause for class treatment. The burden of proof is on the Plaintiffs to allege and prove that the proposed class is appropriate for certification. The Plaintiffs must satisfy all of the requirements for certification found in Section (a) of Rule 23, and show that the proposed class falls within one of the subsections of Rule 23(b).

Section (a) of Rule 23 provides that a class may be certified if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The parties have stipulated that joinder of all members is impracticable but contest whether the other prerequisites of Section (a) have been satisfied.

### A. *Common Questions of Fact and Law Exist*

The Plaintiffs maintain that there are questions of law and fact common to the proposed class. These questions are said to include whether the Defendants conspired to fix and maintain real estate commissions in Dallas County, whether certain practices of the Defendants were designed and implemented to restrict competition, and whether the members· of the proposed class were injured as a result of those practices.

The Defendants argue that commonality is lacking because the Plaintiffs failed to link each Defendant to the alleged conspiracy at the certification hearing. They maintain that the Plaintiffs have shown, at most, a number of mini-conspiracies each with questions of fact and law unique to itself. The Defendants further argue that commonality is lacking because each member of the putative class must prove individual injury and an amount of damage to recover under Section 4 of the Clayton Act.

With respect to the Defendants' first argument, the question is not whether the Plaintiffs will prevail on their claim at trial, but whether the contours of the case satisfy the requirements for certification. The Plaintiffs have alleged a county-wide conspiracy to fix and maintain brokerage fees. They have further alleged that the effect of the conspiracy accounts for the uniform six percent commission charged each member of the proposed class. These allegations raise questions of fact and law common to the entire class. The fact that the Plaintiffs failed to link each Defendant to the conspiracy is not relevant to the current inquiry.

The Defendants' second argument goes to the separate inquiry of whether common issues predominate over individual issues. The commonality requirement addresses the question of whether there are *any* common questions of law or fact. The existence, scope, and efficacy of the alleged conspiracy are common to all class members. Whether they predominate is a matter to be determined under Rule 23(b)(3).

### B. *Plaintiffs' Claims are Typical of the Class*

The Defendants argue that even if the allegations of price-fixing are true, the claims of each member of the proposed class are atypical because the particular characteristics of each home sold, the particular

demands of each seller, and the varied services provided by each real estate broker would present individualized questions of impact and damages.

■ The requirement of typicality is met where the claims of the named plaintiffs and putative class members are based on the same legal theory and do not conflict. *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1974). The Plaintiffs have alleged a common conspiracy which, if proved, would account for the six percent commission charged each member of the class. Proof of violations of the Sherman Act should be virtually identical for each member of the class. The Court finds the requirement of typicality to be satisfied.

### C. *Adequacy of Representation*

■ Adequate representation is essential to certification because the absent class members will be bound by the orders of the Court. Two criteria must be satisfied for the Court to find adequate representation: (1) the representatives must have common interests with the unnamed class members, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1974).

The Defendants argue that the Plaintiffs are not adequate representatives of the proposed class. They contend that a "pall of suspicion" hovers over the Plaintiffs. The Defendants cite the fact that the Plaintiffs decided to file this lawsuit before the sale of their home was closed. They also cite testimony that after the filing of this lawsuit, Mel Klein approached his employer, a bankruptcy attorney, and asked that he act as purchasing agent for a second home with the hope that his employer would pass his share of the commission on to the Plaintiffs. The Defendants also argue that the Kleins are not adequate representatives because they lack the financial means to prosecute this action.

The Court finds the first argument to be specious. The evidence shows that the Plaintiffs were contractually obligated to pay a six percent commission to the Henry S. Miller Residential Services, Inc., before they consulted their attorney. As for the negotiation for the purchase of the second home, neither the Plaintiff nor his employer were involved in setting the commission rate of the listing broker. Neither the Plaintiffs' decision to exercise their legal rights before the closing in the first instance, nor their attempt to save money on the purchase of the second home impugne their ability to adequately represent the class.

The Court also rejects the argument that the Plaintiffs should be disqualified based on their financial ability to prosecute this action. The Plaintiffs have funded, thus far, a vigorous prosecution of this action including Court-ordered reimbursement of discovery expenses in the amount of $10,-000.00. Moreover, the Plaintiffs' attorneys have assured the Court that they are prepared to advance the cost of further discovery and class notice.

Based on the commonality of interests demonstrated by the Plaintiffs and the forthrightness and competency shown by counsel to date, the Court finds the Plaintiffs to be adequate representatives of the putative class.

The Court concludes that the Rule 23(a) prerequisites to certification have been met.

### V. *Rule 23(b)(3) Damage Class*

The Court must next consider whether the proposed class falls within one or more of the subsections of Rule 23(b). Because the thrust of the Plaintiffs' complaint is for damages, the Court will first consider the propriety of certification under Rule 23(b)(3).

Subsection (3) of Rule 23(b) provides that an action for damages may be maintained as a class action if:

> The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

658

The factors to be considered in determining whether predominance and superiority exists are delineated in the remainder of subsection (3). These factors are:

(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desireability or undesireability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

## A. *Common Questions Do Not Predominate*

[6] As discussed in Part IV of this opinion the fact of damage, or impact, is the *sine qua non* for proving a cause of action under the Clayton Act. The requirement that a plaintiff prove injury to business or property does not change when the private antitrust suit is brought as a class action. Proof of impact is a question unique to each member of the class and must be proved with a fair degree of certainty. *State of Alabama v. Blue Bird Body Co., supra* at 327; *Shumate & Co., Inc., v. Nat'l Assn. of Sec. Deal,* 509 F.2d 147 (5th Cir. 1975).

The fact that impact must be shown with respect to each class member does not necessarily defeat the predominance requirement. If impact can be proved by virtually a mechanical task or by formula calculation, the existence of individualized claims does not defeat certification. *State of Alabama v. Blue Bird Body Co., Inc., supra* at 328. In a price-fixing case involving a homogenous or fungible product impact can generally be shown by proof that the free market price would have been lower than the fixed price and that the plaintiff made purchases at the higher price. *State of Alabama v. Blue Bird Body Co., Inc., supra* at 326 (quoting from *Bogosian v. Gulf Oil Co., Inc.,* 561 F.2d 434 (3d Cir. 1977); *In re Plywood Antitrust Litigation,* 655 F.2d 627, 635 (5th Cir. 1981). However, if the product does not lend itself to generalized proof, but

requires proof by thousands of possible claimants, the justification for class certification is absent.

A less formidable problem is presented in proving the amount of damages. The measure of damages of individual class members may be proved by just and reasonable inference. *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 858 (5th Cir. 1981). If impact is susceptible to determination by generalized proof, individual matters of calculation will not defeat certification. *In re South Central Sales Bakery Products,* 86 F.R.D. 407, 419 (M.D.La.1980).

In *Nichols v. Mobile County Board of Realtors,* (CCH) ¶ 16, 688 (S.D.Ala.1980) the district court of Alabama addressed the question whether the real estate brokerage market lends itself to generalized proof of impact in private antitrust actions. In that case the defendants moved to decertify a damage class on the ground that individual questions of impact predominated over the Sherman Act issues. The plaintiffs argued that the relevant product market was the "brokerage function" or the total services necessary to bring the buyer and seller together. The plaintiffs further argued that generalized proof was possible by comparing the alleged anti-competitive commission to the commission that would prevail in a free market.

The district court disagreed with the plaintiffs' definition of the product market and found the relevant market to be "at least as diverse as the number of real estate brokers, in that each broker offers a unique bundle of services to potential home sellers." The court decertified the class based on the plaintiffs' failure to offer any empirical evidence to show how they could arrive at a competitive commission rate for each class member. The court further suggested that generalized proof was impossible given the diverse product market, the unique characteristics of each home sold, and the demands of each seller.

The class representatives took an interlocutory appeal from the district court's order in *Nichols v. Mobile County Board of Realtors, Inc.,* 675 F.2d 671 (5th Cir. 1982).

The Fifth Circuit affirmed the district court's order of decertification on the ground that the appellants had not shown that the district court abused its discretion in holding that the product market was nonhomogenous and that they had failed to advance a viable theory of generalized proof to establish impact. The Fifth Circuit expressly stated that it did not hold as a matter of law that real estate brokerage services are nonhomogenous or nonfungible or that the impact requirement defeats any chance of class certification in a private real estate antitrust action.

With respect to the impact requirement the court noted that certification would be proper where the class plaintiffs offered generalized proof that the class members paid more than they would have in the absence of an antitrust violation. The court further noted that the impact requirement does not mean that the class representatives have to pinpoint an exact competitive price for each class member. Instead, generalized proof that a competitive commission rate for class members existed over a range, the highest point of which was less than the commissions actually paid, would be sufficient.

In the case before the Court it must be determined whether the Plaintiffs have avoided the shortcomings in proof which befell the class representatives in *Nichols.* Stated differently, the court must determine whether the Plaintiffs offered sufficient proof to establish a homogenous product market that would lend itself to generalized proof of damages and a general method of proof that would establish impact to all class members with a fair degree of certainty.

The Court has carefully reviewed the transcript of the certification hearing and finds that the brokerage services in question are indeed fungible. Real estate brokers perform one basic function and that is providing services for the sale of a home. While it is true that the services offered by real estate brokers vary in many instances, the variance is more properly identified with the broker's overhead in attracting sellers in a service competitive market than with an economic choice to the seller. While one effect of providing various brokerage services may be to attract a seller to a particular multiservice broker, the seller has little, if any, power to negotiate which services in the seller's bundle he wishes to purchase. Instead, the broker offers to contract the services offered by his firm for a non-negotiable six percent commission. The seller's alternative to accepting the offer is to turn to another six percent broker with a similar non-negotiable bundle of services. The fact that a seller may in some instances benefit from his choice has no more bearing on the fungibility issue than the fact that one broker may work harder than another.

Based on the facts presented in this case the Court makes a different assessment of the product market from that made by the trial court in *Nichols.* The fact that over 90% of the homes sold in Dallas, Texas, during the damage period were made at six percent suggests that the characteristics of the sellers, brokers, and homes are irrelevant. *See, Nichols v. Mobile Board of Realtors, Inc.,* 675 F.2d 671, p. 677 n. 4 (5th Cir. 1982); *Hughes v. Baird & Warner, Inc.,* 1980–2 Trade Cas. ¶ 63,545 (N.D.Ill.1980). The surface distinctions in the services provided by the various brokers do not present a problem of the magnitude encountered in *State of Alabama v. Blue Bird Body Co., Inc., supra.* The Court finds no reason why proof of impact cannot be made on a common basis so long as the common proof shows the commission which would have prevailed in a competitive market and demonstrates *some* degree of injury to each member of the class.

At the certification hearing the Plaintiffs offered the testimony of Dr. Osborne, an economist at the University of Oklahoma, to show that generalized proof of impact was possible. Dr. Osborne differentiated between the economic cost of selling a home in a free market and a market characterized by price collusion. He testified that in a free market the economic cost was comprised of the broker's cost of selling the

home plus a normal competitive profit. In a market characterized by price collusion the economic cost was said to include a third element, the cost of competing in ways other than by price. He stated that the proliferation of services offered by the Defendants was attributable to this third element.

Dr. Osborne observed that from 1970 to 1978 the cost of housing in Dallas County doubled and the number of homes sold increased by 100%. At the same time this activity was occurring there was an influx of sales persons into the market. While the cost of doing business as reflected by various indices increased over this period, it did not do so with the rapidity of the cost of housing. Dr. Osborne stated that in a freely competitive market these factors would have resulted in a fee structure that was tied to the broker's cost of doing business and not to the price of the home sold. The net effect would be a market characterized by lower and differentiated prices for various bundles of negotiable brokerage services.

From these observations Dr. Osborne derived a formula which he believes would provide an estimate of the maximum commission that would have prevailed in a free market. Dr. Osborne chose 1970 as a base year and computed the six percent commission on which he found to be the average sales price of a home in Dallas County, that year. The year 1970 was chosen because it was the last year of open price fixing by the Dallas Board of Realtors. Dr. Osborne attributed that entire figure to the economic cost of selling a home in a competitive market. Dr. Osborne then calculated the average maximum commission for each quarter of the damage period by adjusting the base commission upward by the consumer price index.

Dr. Osborne next testified that the formula could be extended to determine a lower bound estimate of the damage that each member of the proposed class suffered. This extension was made by calculating the difference between the actual average commission and the average competitive commission for each damage quarter. Dr. Osborne stated that the difference between the two figures yielded the average damage suffered by the class for the particular quarter. Calculation of individual damages could be made by comparison. The proportion of damages suffered by any one class member was stated to bear the same ratio to the average lower bound estimate as the selling price of the particular home did to the average price of a home sold in that quarter.

The Defendants pose several objections to Dr. Osborne's formula for determining competitive commissions, impact, and damages. Most of the objections question the basic premise of the formula that real estate commissions in a free market would be tied to the cost of doing business and not the sales price of the home. Other objections such as whether 1970 is a fair base year and whether the consumer price index is a fair measure of the real estate broker's cost of doing business question the fairness of the methodology.

The Defendants also object to the lack of available data to be used in the Plaintiffs' formula. That objection is well taken. The evidence shows that the figures do not exist for the average cost of housing in Dallas, Irving, and Garland for the years 1970 to 1974. The evidence further shows that no figures exist for the average cost of housing in Grand Prairie for the years 1970 to 1978. The figures used by Dr. Osborne were taken from a compilation of average housing costs in a fifteen state area across the South. Dr. Osborne admitted on cross-examination that the only way to establish the average housing cost for the base year would be to compare the figures reflected in the compilation for the years 1974 to 1978 with known Dallas figures for the same period and then to chart an approximate figure by statistical curve. This process yields only an approximation of the base year housing cost.

The Plaintiffs' expert also admitted on cross-examination that using the base year figure from the compilation of the Southern states and adjusting it upward by the consumer price index would result in a finding

of no impact to class members in Irving and Garland for the years 1974 to 1978. He explained that this result was attributable to the fact that housing costs in Garland and Irving were lower than Dallas. He then explained that another base year figure would have to be used for Garland and Irving. This figure could only be found by approximation from another statistical curve comparing known housing costs in Dallas for 1974 with known housing costs for Garland and Irving for the same period.

An even greater problem exists with respect to Grand Prairie because no data exists for any year in question. Dr. Osborne stated that the only way to calculate competitive commissions, impact and damages for sellers in Grand Prairie was to arbitrarily assume that the housing costs were the same as either Dallas, Irving, or Garland.

Another problem exists with the consumer price index data. The index does not limit itself to the measure of the rate of inflation for cities in Dallas County or even the county as a whole. Instead, Dallas County is included in an eleven county area comprised of both metropolitan and rural areas. The accuracy of the rate of inflation is essential because it forms the basis for measuring the competitive brokerage commission in each city.

The Court finds the lack of data fatal to the Plaintiffs' offer of generalized proof of competitive commission rates and impact. The approximations cannot form the basis for a finding of impact with the certainty required in this Circuit. The Plaintiffs have tendered no other evidence by which general proof of impact can be determined. Determination of liability to each member of the class would therefore have to proceed on an individualized basis. The magnitude of such an inquiry would destroy the usefulness of the class device. The Court concludes that certification under Rule 23(b)(3) is improper.

VI. *Rule 23(b)(1)(A) and 23(b)(1)(B) Class*

The Plaintiffs have argued as an alternative to certification under Rule 23(b)(3) that the Court certify this action under one or more subsections of Rule 23(b)(1). Rule 23(b)(1) provides that certification is proper if the prerequisites of Rule 23(a) have been met and:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

The purpose for allowing class certification under Rule 23(b)(1) is to prevent the potential adverse effects of separate actions on either the opposing party or absent class members. The need to meet a threat of inconsistent adjudications which is the thrust of Rule 23(b)(1)(A) and 23(b)(1)(B) is not substantial here since we are not dealing with a common fund and since different results as to adjudications involving different individuals could be distinguished on the grounds of different facts.

The only area in which a decision in the Plaintiffs' case could have any use in a proceeding by any other member of the class would be the use of an opinion by the Court in the Plaintiffs' case on the issue of the legality of particular practices of the Defendants as legal precedent in some other action. However, where the only potential adverse effect on absent class members is the *stare decisis* effect within the jurisdiction, a suit will not qualify under Rule 23(b)(1). *See, Larionoff v. United States*, 533 F.2d 1167, 1181 n. 36 (D.C.Cir.1976); *William Goldman Theatres, Inc. v. Paramount Film Dist. Corp.*, 49 F.R.D. 35 (E.D.Pa.1969). Certification under Rule 23(b)(1) is improper.

VII. *Rule 23(b)(2) Injunctive Class*

The Plaintiffs assert Rule 23(b)(2) as a final ground for certification. Certification

is appropriate under Rule 23(b)(2) where (1) the opposing party's conduct or refusal to act is generally applicable to the class, and (2) final and injunctive relief is requested for the class. With respect to this latter criteria injunctive relief must be the underlying and predominate basis for the suit. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 564 (2d Cir. 1968); *Walker v. City of Houston,* 341 F.Supp. 1124, 1131 (S.D.Tex.1971); *Haskins v. Montgomery Ward & Co.,* 73 F.R.D. 499, 502 (S.D.Tex.1977).

It is clear from the Plaintiff's motion for class certification and the evidence offered in support of that motion that the primary thrust of this action is for money damages. While the Plaintiffs have plead for injunctive and declaratory relief, the request is peripheral to the claim for damages. Moreover, the need for injunctive relief is obviated by the fact that the Plaintiffs have defined their class as composed of home sellers between 1974 to 1978. There has been no showing that relief is required to protect the class thus defined. Certification under Rule 23(b)(2) is improper.

It is ORDERED that the Plaintiff's Motion for Class Certification is in all respects denied.